**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

MICHELLE L. BRANDT,

       Plaintiff,

vs.

CITY OF CEDAR FALLS; LISA
ROEDING; JACQUE DANIELSEN;
JOHN BOSTWICK; JEFF OLSON; and
JENNIFER RODENBECK,

       Defendants.

No. 20-CV-2013-CJW-MAR

**ORDER**

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................. 2

II.    FACTUAL BACKGROUND .............................................. 2

III.   APPLICABLE LAW .......................................................... 8

     A.    Summary Judgment .................................................. 8

     B.    Statute-of-Limitations on IRCA Claims ...................... 10

IV.   ANALYSIS ...................................................................... 11

     A.    Age Discrimination .................................................. 11

     B.    Disability Discrimination ........................................... 17

     C.    Hostile Work Environment ......................................... 22

     D.    Retaliation ............................................................... 25

     E.    FMLA Violations ....................................................... 26

V.    CONCLUSION ................................................................. 36

# I.   INTRODUCTION

This matter is before the Court on defendants' Motion for Summary Judgment filed on March 5, 2021.  (Doc. 17).  On April 9, 2021, plaintiff timely filed a resistance.  (Doc. 27).  On April 21, 2021, defendants timely filed a reply.  (Doc. 36).  On May 14, 2021, the Court heard oral argument on defendants' motion.  (Doc. 37).  For the following reasons, the Court **grants** defendants' motion.

# II.   FACTUAL BACKGROUND

Plaintiff was employed by defendant City of Cedar Falls, Iowa ("Cedar Falls") in various part-time positions from 2001 through 2018.  (Doc. 2, at 4, 8).  Defendant Jacque Danielsen ("Danielsen") was the Senior Secretary and later the City Clerk for Cedar Falls.  (*Id.*, at 3).  Defendant John Bostwick ("Bostwick") was the Acting Fire Chief and Assistant Director of Public Safety Services for Cedar Falls.  (*Id.*, at 4).  Defendant Jeff Olson ("Olson") was the Public Safety Director for Cedar Falls.  (*Id.*).  Defendant Lisa Roeding ("Roeding") was the Manager of Finance and Business Operations (the "Business Department") for Cedar Falls.  (*Id.*, at 3).  Defendant Jennifer Rodenbeck ("Rodenbeck") was the Director of the Business Department for Cedar Falls.  (*Id.*, at 4).

On February 5, 2001, plaintiff was hired as a part-time administrative clerk for Cedar Falls in the Public Record Division.  (Doc. 17-2, at 12, 90).  In July 2001, she was reclassified as a part-time secretary.  (*Id.*, at 91).[1]  On March 8, 2010, plaintiff was transferred to a part-time position at the Fire Department at her request.  (*Id.*, at 12, 92).  In July 2014, her title changed to administrative clerk.  (*Id.*, at 93).

From 2014 to 2017, plaintiff applied for at least five other administrative clerk positions with Cedar Falls, three of which were full-time.  (*Id.*, at 33–34).  Specifically, plaintiff applied for (1) a part-time position on June 20 of an unknown year; (2) a part-

---

[1] Some documentation states plaintiff was reclassified in July 2002.  *See* (Doc. 17-2, at 12).  The exact year is immaterial here.

time position in August 2014; (3) a full-time position in October 2014; (4) a full-time position in December 2015; and (5) a full-time position in March 2017. (*Id.*); *see also* (*Id.*, at 17) (finding plaintiff's most recent job application was submitted on May 16, 2017). During her deposition, plaintiff speculated that she also applied for a full-time position in December 2017. (*Id.*, at 123–24).[2] Plaintiff alleges she was consistently passed over for promotions and younger, less experienced candidates were hired for the positions instead. *See, e.g.*, (*Id.*, at 34).

Plaintiff first requested leave under the Family and Medical Leave Act ("FMLA") in April 2007 (*Id.*, at 68–73), but she began requesting leave more frequently during the last two years of her employment. In the summer of 2016,[3] she requested leave to attend medical appointments related to her temporomandibular joint dysfunction ("TMJ") and temporomandibular joint disorder ("TMD"). (*Id.*, at 12, 74–76, 120–21). In approximately October 2017, plaintiff submitted another FMLA application at defendants' request to cover a referral to a psychiatrist for anxiety, depression, and attention deficit hyperactivity disorder ("ADHD"). (*Id.*, at 13, 77–78, 121–23). Due to plaintiff's mental health issues, Dr. Abdur Rahim ("Dr. Rahim") stated that plaintiff required a ten-minute break every two hours as a form of intermittent FMLA leave. (*Id.*, at 13, 116). Plaintiff already had a 15-minute break as part of her employment before she requested the FMLA ten-minute breaks. (Doc. 33-1, at 3–4). Because plaintiff's 15-minute break-time was shorter than her combined 20-minute FMLA break-time, plaintiff testified that defendants improperly required her to arrive early or stay late by five minutes to make-up the difference. *See, e.g.*, (Doc. 17-2, at 101, 106, 117); *see also*

---

[2] Plaintiff also testified that she applied for a full-time position in the Housing Division in "the fall or winter of 2014." (Doc. 17-2, at 124). It is unclear whether she is referring to one of the positions listed above or some other job. This issue is also immaterial here.

[3] The Iowa Civil Rights Commission ("ICRC") noted that plaintiff submitted her request on June 30, 2016, but the application has a fax date of August 11, 2016.

(Doc. 33-1). On January 29, 2018, plaintiff submitted another FMLA application for leave to care for her elderly mother. (Doc. 17-2, at 83–86, 122).[4]

Plaintiff asserts that defendants were hostile toward her FMLA leave requests. For example, plaintiff testified that after she returned from her 2007 FMLA leave, she witnessed a coworker speaking with Danielsen and Danielsen smiling and responding to the coworker, "I can't do anything about it until the doctor signs her off." (*Id.*, at 120). Although plaintiff concedes that this comment was not said to her and she does know what it was about, she "felt intimidated." (*Id.*).

Plaintiff also argues that she was subjected to other forms of harassment throughout her employment. As to her age, plaintiff testified that Bostwick once called her an "old hag" sometime between 2014 and May 2016. (*Id.*, at 118). She also stated that she "got the impression" from her coworkers that she could not "learn as quick as a younger person" or maybe that she could not learn from employee binders as well. (*Id.*, at 119). As to the work environment generally, plaintiff testified that Bostwick flung rubberbands and paper clips over a filing cabinet and onto her desk "on a couple occasions" between 2015 and 2016. (*Id.*, at 118–19). Plaintiff stated that, by mid-2017, most of her coworkers did not greet her when she arrived at work. (*Id.*, at 39). Plaintiff also testified that, on one occasion in late 2017, Bostwick and two others made barking sounds and laughed in the copier room which she felt was directed at her because Bostwick made eye contact with her. (*Id.*, at 127).

---

[4] The ICRC noted that plaintiff "previously applied for FMLA leave in March 2016 to assist her mother with medical appointments and other assistance." (*Id.*, at 12–13). Plaintiff at one point mentioned that she took FMLA leave on November 25, 2017, to assist her mother. (*Id.*, at 60). Plaintiff also testified that defendants asked her about her mother's health in a meeting in late 2014 and that she realized around that time that she should request FMLA leave to care for her mother. (*Id.*, at 114). Plaintiff testified, however, that none of her FMLA applications before January 2018 concerned her mother. (*Id.*, at 122). In sum, it is unclear whether some of plaintiff's earlier leave requests involved her mother.

In early 2016, plaintiff began splitting her time between the Fire Department, the Business Department, and the Police Department. (*Id.*, at 95). In May 2016, plaintiff began splitting her time between the Fire Department and the Section 8 Housing Assistance Division (the "Housing Division"). (*Id.*, at 96–97). That same month, plaintiff met with Danielsen, Roeding, and Bostwick to discuss why she was being passed over for full-time positions. (*Id.*, at 112–13). Plaintiff testified that "things started to go wrong" after that meeting. (*Id.*, at 113). Plaintiff "believes" Bostwick, her supervisor at the time, began questioning staff about plaintiff and may have instructed staff to find errors in plaintiff's work. (*Id.*, at 113–14). For example, plaintiff alleges her coworker, Andrea Ludwig ("Ludwig"), left "screenshots" about plaintiff on the office printer, that plaintiff retrieved the screenshots and gave them to Ludwig, and that Ludwig then gave them to Roeding. (*Id.*, at 114). Plaintiff further suggests that someone, likely Roeding, instructed Pat Freese, another coworker, to find errors in plaintiff's work. (*Id.*, at 115).

On July 5, 2016, while working in the Housing Division, Olson served plaintiff with a "Counseling Memo" (the "Memo") which accused plaintiff of being unproductive, being rude to the public, and improperly closing the office on one occasion. (*Id.*, at 44–45, 98). This was the first time plaintiff had received any form of discipline during her employment with Cedar Falls. (*Id.*, at 42). Plaintiff indicated her previous performance reviews were consistently positive. (*Id.*). After receiving the Memo, plaintiff met with Olson and Bostwick. (*Id.*, at 98). Plaintiff testified that, during that meeting, Olson suggested rescinding the Memo. (*Id.*). In July or August 2016,[5] plaintiff issued a written reply to the Memo in which she claimed the allegations against her were generally inaccurate and unfair, but acknowledged that she was still adjusting to a new job and that her medication may be affecting her mood. (*Id.*, at 46–49). Plaintiff also blamed her

---

[5] The letter is dated July 12, 2016, but refers to "today's date" as August 16, 2016. (Doc. 17-2, at 46–49).

productivity issues on a lack of training and frequent office interruptions. (*Id.*). On August 22, 2016, plaintiff was transferred to the Business Department. (*Id.*, at 99).

On May 26, 2017, plaintiff received an "Employee Disciplinary Report" (the "First Report") and a verbal reprimand from Roeding and Rodenbeck. (*Id.*, at 50–51, 102). The First Report, written by Roeding, noted Roeding met with plaintiff several times over the last year to discuss performance issues. (*Id.*, at 50). The First Report detailed three specific errors in plaintiff's work. (*Id.*). During a meeting about the First Report, plaintiff cited her medications as causing changes in her mood. (*Id.*, at 102). Defendants then requested a list of plaintiff's medications, which they forwarded to City Attorney Kevin Rogers ("Rogers"). (*Id.*, at 103). According to plaintiff, Rogers determined that "none of the medications would cause side effects that would lead to the problems that were addressed." (*Id.*).

On September 1, 2017, Roeding and Rodenbeck served plaintiff with another "Employee Disciplinary Report" (the "Second Report"). (*Id.*, at 52–54). The Second Report outlined eight specific deficiencies in plaintiff's work and alleged she reacted rudely when confronted by Ludwig about a workplace error. (*Id.*). Roeding met with plaintiff to discuss the Second Report. (*Id.*, at 104).

On December 19, 2017, Roeding and Rodenbeck served plaintiff with another "Employee Disciplinary Report" (the "Third Report") and a one-day suspension. (*Id.*, at 55–58). The Third Report similarly contained a list of 14 performance-related issues, one of which concerned tardiness. (*Id.*). Roeding and Rodenbeck also met with plaintiff about the Third Report. (*Id.*, at 105). On January 4, 2018, plaintiff issued a written response challenging the violations in the First, Second, and Third Reports collectively. (*Id.*, at 59–61). Plaintiff criticized her job training, accused her coworkers of being harsh and rude, and generally argued that the violations were overstated, inaccurate, unfair, or the result of insufficient training, poor instructions from her coworkers, or time

6

constraints. (*Id.*). Plaintiff, however, also admitted to a handful of errors and highlighted areas in which she felt she had improved. (*Id.*).

On March 2, 2018, during a meeting with Roeding and Rodenbeck, plaintiff received a final "Employee Disciplinary Report" (the "Fourth Report") terminating her employment. (*Id.*, at 62–65). The Fourth Report outlined 16 violations, one of which concerned tardiness. (*Id.*). The Fourth Report stated the following as the basis for plaintiff's termination:

> [Plaintiff] has been given numerous chances to better her quality of work. It has become evident that her work quality is not up to the standards required for an Administrative Clerk. Since [plaintiff] continues to have the same performance issues and based on not meeting these performance issues efficiently and in accordance with established quality standards, including following established guidelines and procedures, [plaintiff] is terminated from her position of Administrative Clerk with the City of Cedar Falls, effective immediately, with her last working day being March 2, 2018.

(*Id.*, at 65). Following a meeting with Roeding and Rodenbeck, plaintiff left work immediately and did not file a written response. (*Id.*, at 107). Plaintiff testified that she was surprised by the Fourth Report because Roeding and Rodenbeck had previously told her that her work was improving. (*Id.*, at 108). Plaintiff testified that her age was not discussed during her termination meeting and that she did not recall any discussion of her mental or physical disabilities. (*Id.*, at 107–08). She testified, however, that she may have mentioned her medical conditions in prior meetings "and not being able to learn by reading a binder." (*Id.*, at 108).

On June 4, 2018, plaintiff filed a complaint with the ICRC alleging a failure to accommodate, failure to promote, undesirable transfer, failure to train, improper discipline, improper termination, unequal pay, harassment, suspension, and retaliation.

7

(*Id.*, at 3–7).[6]  The ICRC administratively closed the case without further processing. (*Id.*, at 7–26).  On December 18, 2019, plaintiff filed a Petition against defendants in the Iowa District Court for Black Hawk County.  (Doc. 2).  Plaintiff asserted five claims: (1) age discrimination and failure to train and promote in violation of Iowa Code Chapter 216; (2) disability discrimination in violation of the same chapter; (3) hostile work environment and harassment based on age and/or disability in violation of the same chapter; (4) retaliation in violation of the same chapter; and (5) violation of FMLA rights. (*Id.*, at 8–13).  On March 2, 2020, defendants removed the case to this Court.  (Doc. 1).

## III.  APPLICABLE LAW

### A.  Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  When asserting that a fact is undisputed or is genuinely disputed, a party must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Alternatively, a party may show that "the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  FED. R. CIV. P. 56(c)(1)(B).  More specifically, a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."  FED. R. CIV. P. 56(c)(2).

---

[6] The Complaint is dated May 4, 2018, but the date June 4, 2018, appears in the fax line at the top of every page.  The ICRC also noted that the Complaint was filed on June 4, 2018.  (Doc. 17-2, at 17).

A fact is "material" if it "might affect the outcome of the suit under the governing law[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "An issue of material fact is genuine if it has a real basis in the record," *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citation omitted), or "when a reasonable jury could return a verdict for the nonmoving party on the question," *Wood v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (internal quotation marks and citation omitted). Evidence that presents only "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of fact genuine. In sum, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" that it requires "a jury or judge to resolve the parties' differing versions of the truth at trial." *Id*. at 249 (citation and internal quotation marks omitted).

The party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citation omitted). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or other evidence designate specific facts showing that there is a genuine issue for trial. *See Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005).

In determining whether a genuine issue of material fact exists, courts must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that can be drawn from the facts. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014); *Matsushita*, 475 U.S. at 587–88 (citation omitted); *see also Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009) (stating that in ruling on a motion for summary judgment, a court must view the facts "in a light most favorable to the non-moving party—as long as those facts are not so 'blatantly contradicted by the

9

record . . . that no reasonable jury could believe' them") (alteration in original) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). A court does "not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004) (citation omitted). Rather, a "court's function is to determine whether a dispute about a material fact is genuine[.]" *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376–77 (8th Cir. 1996). When considering a motion for summary judgment, the court "need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3).

### B.    Statute-of-Limitations on IRCA Claims

Counts 1, 2, 3, and 4 of plaintiff's Petition assert claims under Iowa Code Chapter 216, i.e. the Iowa Civil Rights Act ("IRCA"). (Doc. 2, at 8–13). Iowa Code Section 216.15(13) states that "a claim under this chapter shall not be maintained unless a complaint is filed with the [ICRC] within three hundred days after the alleged discriminatory or unfair practice occurred." Iowa Code Section 614.8 provides exceptions to this rule for minors and persons with mental illness, neither of which apply here.

The continuing violation doctrine, however, provides a caveat to this statute-of-limitations. The doctrine holds that "certain kinds of claims are not time-barred, 'so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period.'" *Scott v. City of Sioux City*, 68 F. Supp. 3d 1022, 1032 (N.D. Iowa 2014) (quoting *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 122 (2002). So long as one act falls within the limitations period, prior acts may be cited "as background evidence in support of a timely claim." *Farmland Foods, Inc. v. Dubuque Hum. Rts. Comm'n*, 672 N.W.2d 733, 741 (Iowa 2003) (citation omitted).

Here, plaintiff filed her complaint with the ICRC on June 4, 2018. Thus, she must identify at least one act that occurred on or after August 8, 2017, to satisfy the applicable

10

300-day statute-of-limitations as to Counts 1, 2, 3, and 4. *See* (Doc. 30, at 22, 23) (noting plaintiff agrees that this statute-of-limitations applies). If such an act is identified, prior acts may be considered as background evidence to support her claims.

## IV. ANALYSIS

The Court will address plaintiff's claims as follows: (1) age discrimination; (2) disability discrimination; (3) hostile work environment; (4) retaliation; and (5) FMLA violations, both based on retaliation and interference. (Doc. 2, at 8–13). The Court will also address the timeliness of Counts 1, 2, 3, and 4.

### A. Age Discrimination

In her Petition, plaintiff alleges that defendants failed to train or promote her because of her age. (*Id.*, at 8–9). Plaintiff also alleges she was terminated because of her age. (*Id.*).

### 1. Timeliness

Defendants argue that plaintiff's age discrimination claim is time-barred to the extent it is based on a failure to promote because plaintiff did not apply for any jobs on or after August 8, 2017. (Doc. 20, at 13–14). Plaintiff argues this claim is not barred because she testified that she applied for a full-time position in December 2017. (Doc. 30, at 23).

The Court finds that plaintiff's age discrimination claim is time-barred to the extent is it based on a failure to promote. In response to an interrogatory asking her to identify "[t]he specific position and date of application for each" full-time position she applied for, plaintiff identified only three full-time positions. (Doc. 17-2, at 33–34). She answered that she submitted her most recent application on February 21, 2017, and that the position had an application deadline of March 1, 2017. (*Id.*). Her Petition alleges the most recent full-time job advertised was in May 2017. (Doc. 2, at 4). The ICRC similarly noted that plaintiff's last application was submitted on May 16, 2017. (Doc. 17-2, at 17, 22). The only suggestion in the record that there was some other full-time

11

position that plaintiff applied for in December 2017 is her speculation during her deposition. (*Id.*, at 123). When asked when she submitted her most recent application for a full-time position, plaintiff answered: "That would have been probably—it was in 2017. It was—I would just be speculating. It was December possibly." (*Id.*). She stated that Paulsen was hired for the position. (*Id.*). The ICRC, however, noted that Paulsen was hired for a full-time position in May 2017. (Doc. 17-2, at 13).

Plaintiff's admitted speculation is not competent summary judgment evidence. *See Engstrand v. Pioneer Hi-Bred Int'l*, 946 F. Supp. 1390, 1396 (S.D. Iowa 1996) ("Mere speculation 'does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.'") (quoting *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 932 (7th Cir. 1995)); *see also Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994) (holding that unsubstantiated assertions, conclusory allegations, improbable inferences, and unsupported speculation are not competent summary judgment evidence). Given that the record outside plaintiff's speculation indicates that her most recent application for a full-time job was in March or May 2017, she has not presented competent evidence sufficient to create a genuine issue of material fact on this issue. Because any failure to promote plaintiff occurred before August 8, 2017, it is outside the statute-of-limitations and cannot serve as the basis of her age discrimination claim.

For these reasons, the Court finds that plaintiff's age discrimination claim is time-barred to the extent it rests on a failure to promote. In the alternative, the Court will discuss the merits of this claim below. The Court will also discuss plaintiff's age discrimination claim as it relates to failure to train and termination.[7]

_____

[7] Because defendants' alleged failure to train was an ongoing issue in plaintiff's employment and because plaintiff was terminated after August 8, 2017, it does not appear there are any timeliness concerns with these claims.

## 2. Merits

As an initial matter, the parties extensively discuss which standard the Court should apply in analyzing plaintiff's discrimination claims under the IRCA; the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) or the motivating factor analysis of *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989). Serendipitously, after the parties filed their briefs, the Eighth Circuit Court of Appeals issued an opinion holding that "absent further instruction from the Iowa Supreme Court to the contrary, we will continue to apply the *McDonnell Douglas* framework to ICRA discrimination claims at summary judgment." *Carter v. Atrium Hospitality*, No. 20-1192, 2021 WL 1954836, at *3 (8th Cir. May 17, 2021). Thus, this Court is now bound to apply the *McDonnell Douglas* framework.

"To warrant submission of [their] age discrimination claim to the jury, [plaintiffs] must first establish [they were] a victim of age discrimination. This may be accomplished by direct or indirect evidence." *Hedlund v. State*, 930 N.W.2d 707, 719 (Iowa 2019) (citations omitted). Direct evidence shows "a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *King v. United States*, 553 F.3d 1156, 1160 (8th Cir. 2009) (quoting *Ramlet v. E.F. Johnson Co.*, 507 F.3d 1149, 1152 (8th Cir. 2007)). "'[S]tray remarks in the workplace,' 'statements by nondecisionmakers,' and 'statements by decisionmakers unrelated to the decisional process' do not constitute direct evidence." *Id.* (quoting *Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.*, 444 F.3d 961, 966 (8th Cir. 2006)). Rather, direct evidence "may include 'evidence of actions or remarks of the employer that reflect a discriminatory attitude,' 'comments which demonstrate a discriminatory animus in the decision process,' or comments 'uttered by individuals closely involved in employment decisions.'" *Id.* (quoting *King v. Hardesty*, 517 F.3d 1049, 1058 (8th Cir. 2008)). Direct evidence "must be strong enough to

13

demonstrate discriminatory intent without requiring an inference." *Montgomery v. Gen. Atomics Int'l Servs. Corp.*, No. 3:18-cv-90-JAJ-SBJ, 2019 WL 6771753, at *6 (S.D. Iowa Nov. 27, 2019) (citation omitted).

"A plaintiff who lacks direct evidence of discrimination may still survive summary judgment by showing a genuine dispute of fact under the burden-shifting framework" of *McDonnell Douglas*. *Id.* The burden-shifting framework requires the following:

> At the first step of the analysis, the plaintiff has the burden of establishing a prima facie case of age discrimination. A successful showing creates a presumption that the employer unlawfully discriminated against the plaintiff and shifts the burden to the employer to articulate a legitimate nondiscriminatory reason for its actions. If the employer meets this burden, the presumption of discrimination dissolves and the burden returns to the plaintiff to demonstrate that the proffered reason is a mere pretext for age discrimination.

*Ridout v. JBS USA, LLC*, 716 F.3d 1079, 1083 (8th Cir. 2013) (citations omitted) (applying the *McDonnell Douglas* standard). The first step—plaintiff's burden to show a prima facie case—requires the following:

> [A plaintiff] must show that he [or she] (1) was a member of a protected class, (2) suffered an adverse employment action, (3) was performing adequately or qualified for the job at the time of the adverse employment action, and (4) was replaced by someone substantially younger, so as to permit an inference of age discrimination.

*Montgomery*, 2019 WL 6771753 *7 (citations omitted). Further, pretext can be shown in many ways, including by (1) persuading the court that the employer was more likely motivated by discrimination, (2) "showing that the given explanation has no basis in fact or changed . . . over time," or (3) showing that the stated reason has not been consistently enforced in the past. *Id.* (citation omitted). A plaintiff must identify circumstances creating a reasonable inference of discriminatory animus beyond merely discrediting the given explanation. *Id.* (citation omitted).

Defendants argue that they identified numerous, legitimate concerns with plaintiff's work performance over time and gave her several opportunities to improve. (Doc. 20, at 16–20). Thus, defendants argue that plaintiff cannot show that she was performing adequately as is necessary to state a prima facie case. (*Id.*, at 20–21). Defendants also argue that plaintiff's disciplinary reports clearly articulate legitimate, nondiscriminatory grounds for her termination, and there is no indication of pretext. (*Id.*, at 21–22). In sum, defendants conclude that plaintiff cannot show that she was terminated or subject to any other adverse action because of her age. (*Id.*, at 21).

Plaintiff argues she has generated a genuine issue of material fact here. She highlights that Bostwick allegedly once called her an "old hag," that coworkers allegedly suggested she was not as "trainable" as younger employees, that she only began receiving disciplinary reports in recent years as she aged, and generally that her coworkers conspired against her to call her out on trivial work errors. (Doc. 30, at 27–31). Plaintiff concludes that a reasonable jury could view these facts and find that "[d]efendants did not want an old employee around." (*Id.*, at 32). Plaintiff argues that the longevity of her employment and lack of prior disciplinary issues creates an inference that her recent disciplinary reports were pretextual and based on her age. (*Id.*, at 33–34).

Here, there is no direct evidence of age-related discrimination as to failure to promote, failure to train, or plaintiff's termination. Plaintiff could identify only one instance when her age was ever mentioned, i.e. when Bostwick allegedly called her an "old hag" one time at some point between 2014 and May 2016. Assuming Bostwick made this comment, as the Court must at this stage, plaintiff provides no context for it other than that she reacted in an annoyed or disapproving manner. *See* (Doc. 17-2, at 118) ("I just looked at him and shook my head."). Further, there is no indication Bostwick was responsible for any of the employment decisions at issue here. Also, the statement allegedly occurred before plaintiff began receiving disciplinary reports and years before she was terminated. In sum, this is not direct evidence, but rather, a stray

15

remark in the workplace, albeit an offensive and marginalizing one, by a non-decision-making coworker. *See King*, 553 F.3d at 1160.

Turning to indirect evidence, plaintiff's claim for age discrimination is similarly without merit. The Counseling Memo and the First, Second, Third, and Fourth Reports identify a litany of ongoing and escalating issues with plaintiff's work performance, some of which she acknowledged were legitimate and some of which she challenged. These reports indicate plaintiff was not performing her job adequately over the course of about two years, thus defeating her prima facie case. Regardless of plaintiff's belief that the violations in the disciplinary reports were more attributable to poor training, nitpicking, or the fault of her coworkers, the fact is that the record clearly shows that she was not performing her job adequately as determined by defendants.

Even if plaintiff had stated a prima facie case, she cannot rebut the legitimate and nondiscriminatory grounds laid out in the disciplinary reports. Rather, plaintiff offers only speculation that defendants' actions were a pretext for age discrimination. *See* (Doc. 17-2, at 119) ("I got the impression I couldn't learn as quick as a younger person, such as [Ludwig]. Or I maybe couldn't read the four-inch binder or six-inch binder. That's not the way I learn. And so even though [there were no direct statements about my age], I felt that indirectly."). For instance, even accepting that her coworkers were asked to monitor her work product, there is no indication this was done because of her age as opposed to a concern with the quality of her output and work product. Plaintiff relies on a bare inference that because she did not receive any employee disciplinary reports when she was younger that the reports she received toward the end of her employment must have been age-related. This inference, however, is unreasonable. *See Montgomery*, 2019 WL 6771753 *7. It is nothing more than speculation that plaintiff's age had anything to do with the adverse employment actions she complains of. No reasonable jury could conclude, based only on an inference from the longevity of plaintiff's employment and an isolated and remote comment from a coworker, that plaintiff's

16

performance issues were merely a long-term ruse to force out an otherwise satisfactory employee due to her age.

For these reasons, the Court finds that plaintiff's age discrimination claim fails on the merits, and summary judgment is proper on Count 1.

### B.    Disability Discrimination

In her Petition, plaintiff alleges that defendants terminated her employment "on the basis of her disability or their perception" of plaintiff as being disabled in light of her TMJ, TMD, anxiety, and depression. (Doc. 2, at 9–10). Specifically, plaintiff notes that she "was written up multiple times for absences related to medical appointment[s], some of which were FMLA absences." (*Id.*, at 10).

### 1.    Timeliness

Defendants argue that plaintiff's disability discrimination claim is untimely to the extent it is based on a failure to promote. (Doc. 20, at 24–25). The Court does not view plaintiff's disability discrimination claim as resting on failure to promote, but plaintiff does not clarify otherwise. *See* (Doc. 30, at 22–23). To the extent it does, the Court finds it untimely for the same reasons discussed above as to her age discrimination claim.

### 2.    Merits

To prevail on a disability discrimination claim under the IRCA, plaintiffs must state a prima facie case at the outset by showing (1) they have a disability, (2) they were qualified to perform the essential functions of their job, and (3) the circumstances of their termination gives rise to an inference of discrimination based on their disability. *Brandes v. City of Waterloo*, No. 18-CV-2089-KEM, 2020 WL 4209055, at *18 (N.D. Iowa July 22, 2020) (quoting *Goodpaster v. Schwan's Home Serv., Inc.*, 849 N.W.2d 1, 6 (Iowa 2014)). A plaintiff can prove a disability discrimination claim by either direct or indirect

17

evidence. *Lipp v. Cargill Meat Sols. Corp.*, 911 F.3d 537, 543 (8th Cir. 2018).[8] "Direct evidence of discrimination is evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *Jenkins v. Med. Labs. of E. Iowa, Inc.*, 880 F. Supp. 2d 946, 958 (N.D. Iowa 2012) (internal quotation marks and citation omitted). In the absence of direct evidence, the *McDonnell Douglas* burden-shifting framework outlined above applies, i.e. the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action which the plaintiff must then rebut as pretextual. *Brandes*, 2020 WL 4209055, at *18.

Defendants argue that a reasonable jury could not find that plaintiff was qualified to perform the functions of her job in light of the disciplinary reports or that the circumstances here give rise to an inference of discrimination, particularly in light of the legitimate grounds articulated for her termination. (Doc. 20, at 25–31). Plaintiff argues that because her productivity and attendance issues at work were related to her medical conditions, a reasonable jury could find in her favor. (Doc. 30, at 29, 31–35).

When asked to describe her disability discrimination claim in an interrogatory, plaintiff listed several occasions when she was dissatisfied with her training and had disagreements with her coworkers, particularly Ludwig. (Doc. 17-2, at 36–37). The Court fails to see how these allegations state a disability discrimination claim. The relevant inquiry here is whether there is direct or indirect evidence that, when viewed in the light most favorable to plaintiff, would support a reasonable jury's finding that defendants terminated plaintiff due to her disability. To that end, during her deposition,

---

[8] Disability discrimination claims under the Americans with Disabilities Act and the IRCA "are analyzed in the same fashion." *Lipp*, 911 F.3d at 543 n.5 (quoting *Faidley v. United Parcel Serv. of Am., Inc.*, 889 F.3d 933, 940 (8th Cir. 2018) (en banc)).

plaintiff acknowledged she was never told directly that her termination was based on her disability, but that she felt that the reasons given were indirectly related to her physical and mental health issues. (*Id.*, at 108). Specifically, she testified that citing her for poor productivity was related to her ADHD and that the attendance issues related to her FMLA leave. (*Id.*). Thus, because plaintiff concedes that there is no direct evidence here, the Court must determine whether indirect evidence gives rise to a reasonable inference of disability discrimination.

The Memo, issued on July 5, 2016, accused plaintiff of being rude with the public, unproductive, and improperly closing the office on one occasion. (*Id.*, at 44–45). In response, plaintiff only mentioned her medical issues in asserting that her medications may have caused her perceived rudeness. (*Id.*, at 47). The First Report, issued on May 26, 2017, identified three errors related to invoicing, cash receipt entry, and scanning respectively. (*Id.*, at 50). The Second Report, issued on September 1, 2017, identified eight errors or concerns related to cash receipt entry, scanning, invoicing, recordkeeping, proofreading, following directions, and rudeness. (*Id.*, at 52–53). The Third Report, issued on December 19, 2017, identified 14 errors or concerns related to scanning, invoicing, notetaking, time management, proofreading, and, for the first time, tardiness. (*Id.*, at 55–58). As to tardiness, the Third Report stated that plaintiff was late for work once in November 2017 and December 2017 respectively and had been warned about tardiness a few weeks earlier. (*Id.*, at 56). At her deposition, plaintiff testified that she was "make-up time late" because she was required to arrive five minutes earlier to work to accommodate her FMLA intermittent leave. (*Id.*, at 106).

In plaintiff's January 4, 2018 response to the First, Second, and Third Reports, she admitted some of the cited errors, but disputed many others or characterized them as unfair. (*Id.*, at 59–61). Plaintiff explained that her tardiness in November 2017 was "due to an upcoming appointment." (*Id.*, at 60). She attributed her December 2017

19

tardiness to the clock at work being fast. (*Id.*). Plaintiff did not mention her medications or any of her medical conditions.[9]

The Fourth Report which terminated plaintiff's employment, issued on March 2, 2018, identified 16 errors or concerns related to time management, invoicing, proofreading, scanning, communication, following directions, prioritization, deposit entry, and tardiness. (*Id.*, at 62–65). As to tardiness, the report stated that plaintiff was late once in January 2018 and February 2018 respectively, noting that she has an earlier start-time "to accommodate a doctor's request." (*Id.*, at 64). A related Personnel Action Form completed on that same day stated that plaintiff was terminated and ineligible for rehire because she was "not performing assigned job tasks efficiently [and] in accordance with established quality ([continued] below)." (*Id.*, at 67). In a lower section titled "Additional Information," the form notes "standards and attendance issues." (*Id.*).

Plaintiff has not stated a prima facie case because the record shows she was not meeting the essential functions of her job. The Memo and disciplinary reports identify numerous, often repeated errors in ordinary office tasks, devoid of any mention of her medical conditions or medications. Even if she had stated a prima facie case, these listed errors and concerns provide legitimate, nondiscriminatory grounds for her termination. A reasonable jury could not view these detailed reports outlining various deficiencies and conclude that plaintiff was meeting her employer's expectations or that she was fired for a discriminatory reason.

Even viewing the record in the light most favorable to plaintiff, a discriminatory inference cannot reasonably be inferred such that the legitimate grounds stated could be

---

[9] The Third Report characterizes plaintiff's requested day-off from work on November 25, 2017, as being "for a personal matter" and criticized plaintiff for not communicating with her coworkers about duties that may need to be completed in her absence. (*Id.*, at 57). Plaintiff takes issue with characterizing that day as a "personal day," noting it was an "FMLA day to take [her] mother to the doctor due to a fall." (*Id.*, at 60). The Court finds that this issue is immaterial and does not relate to plaintiff's actual or perceived disability.

deemed pretextual. As to her ADHD, plaintiff only speculates that her citations for productivity were alluding to this condition. Plaintiff never brought up her ADHD as a defense in her responses, and there is no indication in the record that this condition was ever discussed, directly or otherwise. As to side-effects from her medication, this issue was only mentioned when plaintiff cited it as an explanation for her perceived rudeness. In the face of all the violations listed in the reports, this alone cannot create an inference that she was terminated for taking medication. That plaintiff believes the side-effects from her medication explains her citations for rudeness or that her ADHD explains some of her productivity issues is insufficient to show that she was terminated *because* of those factors.

Defendants' reference to attendance issues in plaintiff's termination notice is also insufficient to support a disability discrimination claim. Indeed, plaintiff worked slightly different hours to accommodate her medical conditions. That, however, does not change the fact that she was late for work on several occasions, even if she disputes the exact time of some of those occasions. *See Sedlacek v. Univ. of Iowa*, No. 16-1200, 2017 WL 2672648, at *4 (Iowa Ct. App. June 21, 2017) (citing *Casey's Gen. Stores, Inc. v. Blackford*, 661 N.W.2d 515, 519 (Iowa 2003) (holding plaintiffs must show they were "qualified to perform the job *either with or without an accommodation* for [their] disability," concluding a plaintiff's termination for attendance issues was appropriate) (emphasis added). Under Iowa law, "attendance is an essential function of most jobs." *Cole v. Staff Temps*, 554 N.W.2d 699, 705 (Iowa 1996). Thus, "[i]rregular attendance renders a person unqualified for most types of employment and . . . susceptible to legitimate termination." *Id.* (citation and internal quotation marks omitted). Indeed, "[f]orcing an employer to accommodate unpredictable tardiness or absenteeism is unreasonable *even if it is a direct result of the employee's disability*." *Berkey v. Henderson*, 120 F. Supp. 2d 1189, 1193 (S.D. Iowa 2000) (citation omitted). That is not to say that plaintiff exhibited wanton and excessive tardiness here; she was only late

21

for work by a few minutes at most on a handful of occasions. Despite this, tardiness was still a legitimate issue for defendants to note in the disciplinary reports on the few occasions it occurred.

In sum, plaintiff has failed to show that she was meeting the qualifications of her job or that the legitimate reasons provided for her termination were merely pretext for discriminatory animus based on disability. Rather, plaintiff has only speculated that her medical conditions may indirectly relate to some of the reasons given for her termination and that she disagreed with some of those reasons. That is not enough to support her disability discrimination claim.

For these reasons, the Court finds that plaintiff's disability discrimination claim fails on the merits, and summary judgment is proper on Count 2.

### C.     *Hostile Work Environment*

In her Petition, plaintiff alleges defendants "created a hostile work environment for [plaintiff] based on her age and real or perceived disability." (Doc. 2, at 10). Plaintiff alleges she was "terminated as a result of her harassment." (*Id.*, at 11).

#### 1.     *Timeliness*

Defendants argue plaintiff's hostile work environment claim is untimely because she "has not alleged sufficiently harassing acts occurring on or after August 8, 2017[.]" (Doc. 20, at 32–33). Plaintiff argues her claim is timely under the continuing violation doctrine because she received the Third and Fourth Reports after August 8, 2017, which themselves constitute harassment. (Doc. 30, at 35–38). Because the Court has already determined that no reasonable jury could conclude that these reports were issued due to plaintiff's age or disability, they do not constitute harassment and do not bring her claim within the relevant time period. *See Farmland Foods*, 672 N.W.2d at 741.

For these reasons, the Court finds that plaintiff's hostile work environment claim is time-barred. In the alternative, the Court will discuss the merits of this claim below.

### 2. Merits

"Hostile work environment claims are actionable when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Simon Seeding & Sod, Inc. v. Dubuque Hum. Rts. Comm'n*, 895 N.W.2d 446, 468 (Iowa 2017) (citation, internal quotation marks, alteration omitted); *see also Couch v. Iowa Dep't of Hum. Servs.*, No. 15-0432, 2016 WL 5930340, at *7 (Iowa Ct. App. Oct. 12, 2016). Such a claim "recognizes workplace discrimination affects the full spectrum of disparate treatment in the workplace and targets discrimination that requires employees to work in a discriminatorily abusive or hostile workplace." *Farmland Foods*, 672 N.W.2d at 743. To succeed on a hostile work environment claim, a plaintiff must prove "(1) he or she belongs to a protected group; (2) he or she was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; and (4) the harassment affected a term, condition, or privilege of employment." *Simon Seeding & Sod, Inc.*, 895 N.W.2d at 468 (citation omitted).

To be actionable, the harassing conduct at issue must be "extreme rather than merely rude or unpleasant." *Cross v. Prairie Meadows Racetrack & Casino, Inc.*, 615 F.3d 977, 981 (8th Cir. 2010). Indeed, isolated offensive remarks alone are insufficient. *Simon Seeding & Sod, Inc.*, 895 N.W.2d at 468–69 (citation omitted). "A number of factors are relevant in assessing the magnitude of harassment, including the frequency and severity of the discriminatory conduct, whether it is physically threatening or humiliating or only an offensive utterance, [and] whether it unreasonably interferes with the employee's work performance[.]" *EEOC v. CRST Van Expedited, Inc.*, 679 F.3d 657, 686–87 (8th Cir. 2012). A supervisor's instigation or involvement in the alleged harassment may elevate the egregiousness of the conduct. *Delph v. Dr. Pepper Bottling Co.*, 130 F.3d 349, 356 (8th Cir. 1997) (citations omitted). In sum, courts should look to "the totality of the circumstances" in determining whether the conduct at issue created

a hostile work environment. *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 420 (8th Cir. 2010) (citation omitted).

Defendants argue there is no evidence that the alleged harassment at issue was based on plaintiff's age or disability. (Doc. 20, at 33–34). Further, they assert that any harassment was not sufficiently severe or pervasive enough to affect plaintiff's employment. (*Id.*, at 34–38). Plaintiff counters that Bostwick once called her an "old hag," that other employees suggested she was not as "trainable" as a younger person, and that she only began receiving disciplinary reports toward the end of her employment. (Doc. 30, at 38–40). Plaintiff argues that defendants' disciplinary reports were so nitpicky and unfair that they constitute harassment. (*Id.*, at 40–41).

For the reasons discussed in prior sections, the Court finds that, even viewing the evidence in the light most favorable to plaintiff and granting all reasonable inferences in her favor, no reasonable jury could conclude that the disciplinary actions against her were rooted in age or disability-related animus. Plaintiff only speculates that because she did not receive any disciplinary reports when she was younger that the reports at issue here must be harassment based on her age or medical conditions. As discussed, however, there is insufficient evidence to support that assertion. That plaintiff disagrees with a handful of the cited violations or finds many of them to be nitpicky is far from evidence that the violations were a pretext for impermissible harassment.

Setting aside plaintiff's broad assertion that the disciplinary actions against her constituted harassment, the Court is left only with a few isolated incidents which are insufficient to support her claim. Plaintiff can identify only one rude comment during her employment related to her age, i.e. when Bostwick allegedly called her an old hag sometime between 2014 and May 2016. As discussed, this comment is undoubtedly offensive in that it derisively cites a person's age and uses a gender-related slur. Although the comment was allegedly made by her supervisor at the time, it alone is insufficient. This comment is not extreme, it was not repeated, and there is no indication it permeated

the workplace in such a way as to affect plaintiff's employment. Plaintiff has not identified any explicit comments about her medical conditions or disability.

The other allegedly harassing incidents plaintiff cites have no facial relation to her age or disability beyond her mere suspicion. For example, no one ever told plaintiff she was not as trainable as a younger person; she testified that was merely the impression she got. (Doc. 17-2, at 119). Other incidents, such as Bostwick flinging paperclips and rubberbands over a filing cabinet on a few occasions in 2015 and 2016 or coworkers making barking noises in the copier room in late 2017 are isolated and ambiguous at best. Plaintiff also notes that, toward the end of her employment, many of her coworkers did not greet her in the mornings. (*Id.*, at 39). Although the Court is sympathetic, plaintiff's coworkers' alleged lack of congeniality is similarly not extreme and has no apparent connection to her age or disability.

For these reasons, the Court finds that plaintiff's hostile work environment claim fails on the merits, and summary judgment is proper on Count 3.

### D. *Retaliation*

In her Petition, plaintiff alleges that defendants retaliated against her by failing to promote or train her and terminating her employment based on her age and disability. (Doc. 2, at 11–12). Plaintiff identifies four actions she took that she believes caused defendants to retaliate against her: (1) complaining to Roeding "many times about the training [she] was getting with [Ludwig];" (2) asking for finance training, but being denied and instead receiving personnel training; (3) asking for a meeting with Roeding and Danielsen and subsequently not being interviewed for a position; and (4) asking why she was not being promoted at a meeting with Roeding and Danielsen and then receiving the Memo. (Doc. 17-2, at 41).

To establish a prima face case of retaliation, plaintiffs must show that (1) they were engaged in a statutorily protected activity, (2) they suffered adverse employment action, and (3) a causal connection existed between the two. *Sedlacek*, 2017 WL

25

2672648, at *6. If the plaintiff establishes a prima facie case, the defendant must articulate a legitimate, nonretaliatory reason in rebuttal. *Hulme v. Barrett*, 449 N.W.2d 629, 633 (Iowa 1989) (citation omitted). If the defendant does so, the "plaintiff can still prevail if [the plaintiff] can prove that the reason offered was in fact pretextual." *Id.*

Defendants argue summary judgment is appropriate because (1) plaintiff's failure to promote claim is untimely, (2) plaintiff did not engage in protected activity, (3) there is no evidence of any causal connection between plaintiff's age or disability and any adverse employment action, and (4) plaintiff cannot establish that the legitimate reasons cited by defendants were pretextual. (Doc. 20, at 39–44). Plaintiff concedes that summary judgment is appropriate on this claim. (Doc. 30, at 41).

Given plaintiff's lack of resistance, the Court will only briefly analyze this claim. *See, e.g.*, *White v. Kautzky*, 269 F. Supp. 2d 1054, at 1057, 1060 (N.D. Iowa 2003) (noting that courts may grant summary judgment as to unresisted claims if the motion is properly supported). First, as discussed above, any claim based on failure to promote is untimely because there is no competent summary judgment evidence showing that plaintiff applied for a full-time job on or after August 8, 2017. Second, the Court is unaware of any authority holding that complaining about training or asking for a meeting with supervisors are statutorily protected activities. Third, there is no causal connection between any adverse employment action taken by defendants, e.g. serving plaintiff with the Counseling Memo, and the activities plaintiff cites. Last, as discussed above, there is not a reasonable inference of pretext here.

For these reasons, the Court finds that plaintiff's retaliation claim is time-barred to the extent it rests on a failure to promote and otherwise fails on the merits. Thus, summary judgment is proper on Count 4.

### E. *FMLA Violations*

In her Petition, plaintiff alleges that defendants disciplined and terminated her based on her age, disability, and use of FMLA leave. (Doc. 2, at 13). Plaintiff argues

that defendants' actions constitute both retaliation for using her FMLA rights and interference with such rights. (*Id.*).

Under the FMLA, employees are "entitled to a total of 12 workweeks of leave during" a year for limited purposes, such as caring for a parent with a serious health condition or attending to their own serious health condition. 29 U.S.C. § 2612(a)(1). Under Title 29, United States Code, Section 2615(a)(1), employers cannot "interfere with, restrain, or deny the exercise of" any right provided under the FMLA. Under Section 2615(a)(2), employers are barred from discharging or discriminating against an employee in retaliation for the employee invoking FMLA rights. An employee, however, is not entitled to "any right, benefit, or position of employment other than [those] . . . to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(B).

The Eighth Circuit recognizes both FMLA retaliation claims "in which the employee alleges that the employer discriminated against [the employee] for exercising [the employee's] FMLA rights" and FMLA interference claims "in which the employee alleges that an employer denied or interfered with [the employee's] substantive rights under the FMLA." *Phillips v. Mathews*, 547 F.3d 905, 909 (8th Cir. 2008). Here, plaintiff claims both a retaliation and an interference claim. (Doc. 30, at 41, 47). The Court will address each in turn.

### 1. FMLA Retaliation

FMLA retaliation claims are also "evaluated under the *McDonnell Douglas* framework." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 999 (8th Cir. 2011). To establish a prima facie case, plaintiffs must show that: (1) they engaged in protected conduct; (2) they suffered a materially adverse employment action; and (3) that action was causally linked to the protected conduct. *Id.* Taking FMLA leave, or attempting to do so when eligible, is "protected conduct." *Johnson v. Dollar Gen.*, 880 F. Supp. 2d 967, 993 (N.D. Iowa 2012). A materially adverse employment action includes an action

27

that "would deter a reasonable employee from making a charge of employment discrimination." *Fercello v. Cnty. of Ramsey*, 612 F.3d 1069, 1077–78 (8th Cir. 2010). "Unquestionably, termination is an adverse employment action." *Wierman*, 638 F.3d at 999 (citation omitted). As to causation, an employee must show that the employer's adverse action was motivated by retaliatory intent. *Brandes*, 2020 WL 4209055, at *11 (citation omitted). Temporal proximity can be a factor that evidences causation. *Id.* at *11. Such proximity alone, however, is rarely sufficient "unless the time relation is 'extremely close.'" *Id.* (quoting *Lovelace v. Wash. Univ. Sch. Of Med.*, 931 F.3d 698, 706 (8th Cir. 2019)). Generally, "a one-month or two-month lag" between the FMLA request and the adverse employment action "is too long absent other evidence." *Id.* (quoting *Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 925 (8th Cir. 2014)).

If the plaintiff establishes a prima facie case, the defendant "must articulate a legitimate, non-retaliatory reason for its action." *Wierman*, 638 F.3d at 999 (citation omitted). If the defendant does so, the plaintiff "must then identify evidence sufficient to create a genuine issue of material fact whether [the defendant's] proffered explanation is merely a pretext for unlawful retaliation." *Id.*

Defendants argue that there was no causal connection between plaintiff's FMLA requests and her termination, that there is a lack of temporal proximity between plaintiff's exercise of her FMLA rights and her termination, and that defendants articulated legitimate reasons for plaintiff's termination. (Doc. 20, at 47–52). Plaintiff argues she repeatedly complained that her FMLA rights were being violated, highlighting that she was required to arrive early for work to make-up the five-minute difference created by her FMLA intermittent leave. (Doc. 30, at 41–44).[10] Plaintiff also asserts that there is

---

[10] Defendants note that plaintiff's description of her FMLA claim here is markedly different than how she described the claim in an earlier interrogatory which did not mention the five-minute make-up time issue. (Doc. 36, at 10); *see also* (Doc. 17-2, at 42). Although plaintiff has significantly retooled this claim, the Court finds that it should still be considered on the merits.

sufficient evidence to tie her exercise of FMLA rights to her termination. (*Id.*, at 44–47).

The primary issue between the parties is whether plaintiff has established a causal link between her FMLA leave and her termination. Plaintiff requested FMLA leave in 2007, 2016, 2017, and 2018. (Doc. 17-2, at 12–13, 68–86). There is no allegation that plaintiff suffered an adverse action in 2007. At best, plaintiff cited only a vague comment from Danielsen that may or may not have concerned her. (*Id.*, at 120). The fact that she took leave in 2007 without issue could indicate that defendants did not retaliate against her later FMLA requests.[11] Viewing this evidence in the light most favorable to plaintiff, however, her 2007 FMLA request is temporally remote and was reviewed by different supervisors. *See* (Doc. 30, at 45). Thus, that request is of little import here.

As to temporal proximity, plaintiff asserts that her disciplinary issues did not arise until she began taking FMLA leave more frequently in 2016. (Doc. 30, at 44). It is unclear precisely when plaintiff requested FMLA leave in 2016. The ICRC stated that plaintiff's application was submitted on June 30, 2016, but the form itself has a fax date of August 18, 2016. (Doc. 17-2, at 12, 74–76, 120–21). In any event, the treatment dates on the form span from June 13, 2016, through July 18, 2016. (*Id.*, at 75). Given the lack of a clear timeline here, the Court cannot find, as defendants assert, that plaintiff's FMLA request was submitted after she received the Memo on July 5, 2016. (Doc. 20, at 49). Rather, viewing the evidence in the light most favorable to plaintiff, it appears that she may have submitted it several weeks before receiving the Memo or, at the very least, she was receiving treatment related to her FMLA request at the time she received the Memo.

---

[11] Plaintiff also argues that her 2007 FMLA leave is irrelevant because she is older now. (Doc. 30, at 45). This is a variation of her age discrimination claim that the Court has already rejected above. Here, the Court concerns itself with whether defendants retaliated against her for exercising her FMLA rights, not her age.

Despite this, the rough temporal proximity of the Memo and plaintiff's 2016 FMLA leave is not enough to evidence causation here. The Memo lays out three objective issues with plaintiff's work performance that have no apparent relation to her FMLA request. (Doc. 17-2, at 44–45) (discussing a citizen complaint of rudeness, low productivity, and improper closing of the office). The First Report, issued on May 26, 2017, and The Second Report, issued on September 1, 2017, similarly do not mention any FMLA-related issues, and there is no allegation that plaintiff's FMLA leave was discussed in any of the meetings surrounding her discipline. (*Id.*, at 50–54). Notably, these two reports were issued before plaintiff submitted her second application for FMLA leave in the fall of 2017, which requested intermittent leave. (*Id.*, at 13, 77–78, 121).

The only issue related to her FMLA requests to any extent is attendance, which only became an issue in the Third and Fourth Reports. (*Id.*, 55–58, 62–65). Indeed, plaintiff testified that she repeatedly complained to Roeding and Brenda Balvanz ("Balvanz") that she should not be required to arrive to work five minutes early to accommodate her intermittent leave because "it should be part of [her] FMLA leave." (*Id.*, at 116–17, 125); *see also* (Doc. 30, at 48). That said, plaintiff was terminated in small part for arriving late to work, not taking leave. *See Evans v. Coop. Response Ctr., Inc.*, 996 F.3d 539, 546–47 (8th Cir. 2021) (holding that intermittent leave under the FMLA does not excuse attendance issues). There is no dispute that plaintiff was late on most of the occasions cited. At worst, plaintiff argues she was only marked as late on one occasion because the clock at work was a few minutes fast. Plaintiff does not allege that defendants fabricated her tardiness entirely as a pretext to retaliate against her for taking FMLA leave. Thus, at best, plaintiff has stated a prima facie case that her tardiness in part motivated her termination. She has not shown that her exercise of her FMLA rights, however, were part of defendants' motivation.

Even if the Court found that plaintiff had stated a prima facie case, defendants' disciplinary documentation outlines a litany of legitimate concerns with plaintiff's work

grounded in her job performance. The fact that a relatively small number of violations in the later reports concerned plaintiff's tardiness does not create a reasonable inference that her termination was motivated by the FMLA requests she filed in recent years. Nor can defendants' allegedly hawkish criticism of plaintiff's job performance be reasonably attributed to her FMLA requests. In sum, no jury could reasonably infer retaliatory intent based on the longevity of plaintiff's employment and plaintiff's more frequent use of FMLA leave in recent years, particularly in light of the escalating disciplinary reports in the record.

For these reasons, the Court finds that plaintiff's FMLA retaliation claim fails on the merits, and summary judgment is proper on this component of Count 5.

### 2. FMLA Interference

An FMLA Interference claim may arise when "an employer refuses to authorize leave under the FMLA or takes other action to avoid responsibilities under the Act." *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1005 (8th Cir. 2012). To prevail on this claim, a plaintiff must show (1) that the plaintiff was an eligible employee; (2) that the defendant was an employer under the FMLA; (3) that the plaintiff was entitled to FMLA leave; (4) that the plaintiff gave the defendant notice of the plaintiff's intent to take FMLA leave; and (5) the defendant denied the plaintiff FMLA benefits to which the plaintiff was entitled. *Hernandez v. Bridgestone Ams. Tire Ops., LLC*, 831 F.3d 940, 945 (8th Cir. 2016). Unlike in a retaliation claim, proof of discriminatory animus is not required because "the employer's intent in denying the [FMLA] benefit is immaterial[.]" *Lovland v. Emp'rs Mut. Cas. Co.*, 674 F.3d 806, 811 (8th Cir. 2012). The parties do not appear to dispute the first four elements.

"Intermittent leave means leave taken in separate periods of time due to a single illness or injury, rather than for one continuous period of time, and may include leave of periods from an hour or more to several weeks." 29 C.F.R. § 825.102. Title 29, Code of Federal Regulations, Section 825.302(f) states that intermittent leave under the FMLA

can be taken if "medically necessary due to a serious health condition or a serious injury or illness." Upon request, an employee must advise the employer of the reasons why intermittent leave is necessary and, if applicable, the schedule for treatment. 29 C.F.R. § 825.302(f). "The employee and employer shall attempt to work out a schedule for such leave that meets the employee's needs without unduly disrupting the employer's operations, subject to the approval of the health care provider." *Id.*

Intermittent leave is often used to enable employees to attend regularly scheduled medical appointments. *See, e.g.*, *Kastrati v. Progress of Peoples Mgmt. Corp.*, No. 18-CV-6731 (LDH) (LB), 2020 WL 6940991, at *1 (E.D.N.Y. Nov. 24, 2020) (using intermittent leave to attend regular dialysis sessions). Such leave can, however, be invoked to allow an employee to address the effects of a medical condition. *See, e.g.*, *Rutschke v. Nw. Airlines, Inc.*, No. Civ. 04-3212 RHK/AJB, 2005 WL 2100985, at *1 (D. Minn. Aug. 30, 2005) (using intermittent leave to address fatigue and poor circulation related to the employee's diabetes). Intermittent leave can also be used in relation to mental health conditions such as depression. *See, e.g.*, *Ballato v. Comcast Corp.*, 676 F.3d 768, 770 (8th Cir. 2012). Although less common, intermittent leave can also cover small increments of time. *See, e.g.*, *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 862 (8th Cir. 2006) ("[The plaintiff] used this intermittent FMLA leave when she arrived at work 15 or 30 minutes late or wanted to leave work early due to her [severe depression]."); *see also* 29 C.F.R. § 825.205(a) ("When an employee takes FMLA leave on an intermittent or reduced leave schedule basis, the employer must account for the leave using an increment no greater than the shortest period of time that the employer uses to account for use of other forms of leave[.]") ("An employer may account for FMLA leave in shorter increments than used for other forms of leave. For example, an employer . . . may account for FMLA leave in a shorter increment when the employee arrives at work several minutes late[.]").

32

Plaintiff argues that, under the FMLA, she "was supposed to receive unpaid leave" but instead received "paid leave that she was required to make up." (Doc. 30, at 47). Plaintiff asserts defendants Danielsen, Rodenbeck, and Roeding required her to arrive to work early to off-set her intermittent FMLA leave despite her objections. (*Id.*, at 47–48). She argues that she repeatedly asked Roeding and Balvanz to count this time toward her FMLA leave, but they refused. (*Id.*, at 48). Plaintiff argues that giving her an additional five-minute break every day that she was required to make-up did not conform to Dr. Rahim's direction that she should be given a ten-minute break every two hours, i.e. two ten-minute breaks throughout her five- or six-hour part-time workday. (*Id.*, at 48–49).

Defendants assert that plaintiff's interference claim is deficient for several reasons. First, defendants argue that plaintiff's mental health conditions do not entitle her to "unscheduled and unpredictable" absence. (Doc. 36, at 12) (quoting *Spangler v. Fed. Home Loan Bank of Des Moines*, 278 F.3d 847, 853 (8th Cir. 2002)). The Court rejects this argument because plaintiff did not request permission to be absent unpredictably. Rather, she requested two ten-minute breaks every two hours to address her mental health issues as recommended by Dr. Rahim.

Second, defendants argue that plaintiff's work schedule was appropriately adjusted to accommodate her intermittent breaks without disrupting her work. (*Id.*) (citing 29 C.F.R. § 825.302(f)). The record contains sufficient evidence, however, to support plaintiff's assertion that she was required to make up time that she requested as intermittent leave under the FMLA, specifically the five minutes not already encompassed by her preexisting 15-minute break. *See, e.g.* (Doc. 33-1, at 4) ("In order to allow [plaintiff] to be able to complete her work while also exercising her intermittent leave we decided to begin [plaintiff's] work shift 5 minutes earlier."). In effect, a reasonable jury could find that requiring plaintiff to arrive at work earlier denied her the leave to which she was entitled under the FMLA. *See* 29 U.S.C. § 2612(a)(1); *see also Fluur v. Aurora*

33

*Health Care*, No. 06-C-0794, 2009 WL 10713345, at *14 (E.D. Wis. Mar. 27, 2009) ("A reasonable jury could find that requiring an employee to make up FMLA hours or days is interference with the FMLA benefits to which an employee is entitled, i.e., the twelve work weeks of leave permitted during a twelve-month period[.]"). In other words, a reasonable jury could find that defendants did not reasonably adjust plaintiff's schedule to accommodate her intermittent leave but rather, in effect, denied her such leave by simply extending her time in the office. This is true regardless of defendants' intent.

Last, defendants argue that requiring plaintiff to arrive five minutes early to work was de minimis and thus did not violate the FMLA. (*Id.*, at 13). The authority defendants cite, however, concerns the requirement that employees be restored to the same position upon returning from leave aside from de minimis changes. *See* 29 C.F.R. 825.215(f). That is not the situation here. The Court is unaware of any authority holding that a de minimis exception exists for intermittent leave under the FMLA.[12]

There is, however, a related issue with plaintiff's FMLA interference claim: she has failed to produce evidence of damages. "In an action brought under the FMLA, a plaintiff must be able to show a reasonable likelihood that a rational trier of fact would award damages or find an entitlement to injunctive relief to avoid the entry of summary judgment." *McBurney v. Stew Hansen's Dodge City, Inc.*, 398 F.3d 998, 1002 (8th Cir. 2005) (citation, internal quotation marks, and alteration omitted). In other words, even if a plaintiff shows a prima facie case for FMLA interference, they cannot prevail on their claim if they have "not suffered any damages cognizable under the FMLA." *Quinn v. St. Louis Cnty.*, No. 09-1372 ADM/LIB, 2010 WL 3733970, at *6 (D. Minn. Sept.

---

[12] There is a de minimis exception under the FMLA regarding an employer's request that an employee perform minor work-related tasks while on leave, *see, e.g.*, *O'Donnell v. Passport Health Commc'ns, Inc.*, 561 Fed. App'x 212, 216–18 (3d Cir. 2014), but that exception does not apply here. Plaintiff was not contacted while on leave to, for example, forward a document or respond to an email. Rather, she was required to be at the office and working.

Case 6:20-cv-02013-CJW-MAR    Document 38    Filed 06/14/21    Page 34 of 36

20, 2010).  Under the FMLA, an "employer is liable only for compensation and benefits lost by reason of the violation, for other monetary losses sustained as a direct result of the violation, and for appropriate equitable relief, including employment, reinstatement, and promotion." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002) (internal quotation marks and citations omitted).

This is not a case like *Carlsen v. Green Thumb, Inc.*, for example, where the plaintiff had a claim for damages because she was forced to use vacation time to cover leave allegedly denied to her in violation of the FMLA.  No. Civ. 01-2076 JRT/FLE, 2004 WL 1465832, at *4 (D. Minn. May 21, 2004).  Here, at oral argument, plaintiff's counsel clarified that plaintiff is not seeking monetary damages for the time she argues should have been counted towards her FMLA leave.  Further, plaintiff has never requested any form of equitable relief.  *See McBurney*, 398 F.3d at 1002 (affirming summary judgment on FMLA interference claim due to lack of damages, issue of front pay waived).  Thus, plaintiff is left with nominal damages at best, which most courts have held are not recoverable.  *See Carlsen*, 2004 WL 1465832, at *4 (noting that most courts have held that nominal damages are not available under the FMLA, and that the Eighth Circuit has not yet addressed this issue).

This case is more comparable to *Cotton v. AT&T Operations, Inc.*, No. 4:06-CV-438 CAS, 2007 WL 2259318 (E.D. Mo. Aug. 2, 2007).  There, the plaintiff was cited for absenteeism even though she allegedly requested FMLA leave and, a few months later, was terminated for improperly logging time.  *Id.* at *4, *12.  The Eastern District of Missouri granted summary judgment on the plaintiff's FMLA interference claim because plaintiff had not submitted evidence of damages.  *Id.* at *13.  The court noted that the plaintiff returned to work after the attendance issue, received FMLA leave several times thereafter, did not receive a decrease in pay or benefits, and was neither disciplined or demoted.  *Id.* at *14.  Here, although plaintiff's tardiness was cited in the disciplinary reports, they constituted only a small fraction of the overall violations.  A reasonable jury

could not award plaintiff damages for her termination by simply ignoring the vast majority of the cited violations and emphasizing the few instances of tardiness that occurred in the last months of her employment.

For these reasons, the Court finds that plaintiff's FMLA interference claim fails on the merits due to a lack of damages, and summary judgment is proper on this component of Count 5.

## V. CONCLUSION

For these reasons, the Court **grants** defendants' Motion for Summary Judgment (Doc. 17) on all of plaintiff's claims. This case is **dismissed**.

**IT IS SO ORDERED** this 14th day of June, 2021.

_____
C.J. Williams
United States District Judge
Northern District of Iowa

36